IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREGORY MURRAY,

    Plaintiff,

v.

CONTRA COSTA COUNTY, *et al*,

    Defendants.

NO. C 08-1539 TEH

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    This matter came before the Court on July 27, 2009, on Defendant Sandra Andrade's Motion for Summary Judgment. Having carefully considered the parties' written and oral arguments, Defendant's Motion is GRANTED for the reasons set forth below.

**FACTUAL AND PROCEDURAL BACKGROUND**

    Plaintiff Gregory Murray is the father of Baby J, a female child born in February of 2006 as the offspring of Murray's marriage to S.A.M. Murray married S.A.M. on May 26, 2005. He left California for Florida on July 9, 2005,[1] and shortly thereafter initiated proceedings to terminate his marriage to S.A.M. In his Petition for Annulment or in the Alternative Petition for Dissolution of Marriage without Minor Children before the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida, Murray asserted that "[t]here are no children born of the Parties and the Respondent is not pregnant," and that

---

[1] Murray and S.A.M. dispute whether he knew of her pregnancy at the time of his departure from California.

"[t]here are no minor children born of this marriage and none are expected." Holmes Decl., Ex. C, at 1-2. In her response to Murray's petition, S.A.M. stated that she was pregnant with a child she believed to be Murray's; she offered to undergo DNA testing following the birth of the child to prove that Murray was the father. Holmes Decl., Ex. B, at 4. In his reply, Murray denied his paternity of the child that S.A.M. was carrying, and asked for a paternity test. Holmes Decl., Ex. C, at 4. In adjudicating Murray's petition, on September 21, 2006, the General Master made a Report and Recommendation that stated that "[t]here was no evidence presented at the final hearing that there were any children born of the marriage" and ordered that "[t]here are no children born of the marriage." Holmes Decl., Ex. C, at 6. The final judgment of the Circuit Court approved, ratified, and made an order of the court the General Master's Report and Recommendation, and ordered that "[t]here are no children born of the marriage." Holmes Decl., Ex. C, at 8.

At the same time as this series of events in Florida, Baby J was born to S.A.M. in February of 2006 in California. Andrade Decl. at ¶ 5. Contra Costa County's Children and Family Services bureau ("CFS") became immediately involved to ensure the safety of Baby J. *Id.* CFS and S.A.M. worked in Voluntary Family Maintenance to keep Baby J in S.A.M.'s custody, during which time S.A.M. underwent periodic drug testing. *Id.* S.A.M. repeatedly tested positive for psychotropics, opiates, marijuana, and methamphetimines, or simply did not appear for drug tests. *Id.* In July of 2006, CFS transferred the case from Voluntary Family Management to the court unit. *Id.* Andrade prepared a petition on behalf of Baby J and her two half-siblings and filed it on July 12, 2006. *Id.* On August 7, 2006, the alternate defender office requested the children be removed from S.A.M.'s custody, and on August 8, 2006, the court ordered a detention hearing for August 9, 2006. *Id.* at ¶ 6. At that hearing, the juvenile court ordered detention of Baby J and her half-siblings. *Id.* at ¶ 6.

During this period of time, Murray contacted CFS repeatedly regarding this matter. *Id.* at ¶ 7. The parties dispute what happened during this period of time between Murray and the CFS office. Murray asserts that he obtained an order for a paternity test in the divorce proceedings, hired a private investigator to look for S.A.M., and tried to get a paternity test in

2

California, which Castillo and then Andrade refused. Murray Decl. at ¶¶ 5, 7. He claims he told Castillo that he wanted custody of Baby J if she was removed from S.A.M.'s custody, and asserts that he gave her all identifying information. *Id.* at ¶ 9. Murray asserts that he did not know of the legal proceedings, and that he was not given notice of hearings. *Id.* at ¶¶ 10-11. Andrade asserts that her office received a series of rambling messages from Murray, often at odd hours and internally inconsistent with prior messages. Andrade Decl. at ¶ 7. Andrade indicates that he understood that the child might go into foster care, but that he was not in a position to assume custody. *Id.* Andrade left a message with Murray on August 23, 2006, and spoke with him on August 24, 2006, advising him of the jurisdiction hearing on August 31, 2006, informing him that Baby J was in foster care and might be adopted, and referring him to an attorney, which Andrade states that he was not sure he wanted. *Id.* at ¶ 8. CFS notes indicate that Murray acknowledged that he was offered an attorney referral but wanted a private attorney. *Id.* Murray claims he never received a referral. Murray Decl. at ¶ 10. Andrade also states that CFS sent Murray copies of all reports. Andrade Decl. at ¶ 10. Andrade further states that because Murray was not the custodial parent, county policy and applicable law required CFS to work with the custodial mother, not Murray. *Id.* at ¶ 9.

The jurisdiction hearing in this matter was set for August 31, 2006, and continued several times, until it was held on December 12, 2006. *Id.* at ¶ 11. At that point, Andrade's involvement in the case ended. *Id.* Murray contacted the CFS office in January 2007, at which time he was still questioning paternity. *Id.* at ¶ 12. One of Andrade's colleagues arranged for a paternity test, which revealed in May 2007 that Murray was the father of Baby J. *Id.* at ¶ 12. Murray visited with Baby J, took a parenting class, and submitted to a home study. *Id.* Baby J was placed with Murray in August 2007. *Id.*

Murray filed suit in this Court on March 20, 2008, asserting two counts of violation of 42 U.S.C. § 1983. The first count he brought against Defendants Andrade and Castillo for deprivation of his constitutionally protected rights,

> including but not limited to:

3

    (a) the right to petition the courts for a redress of grievances by denying plaintiff access to the courts in violation of plaintiff's rights under the First and Fourteenth Amendments;
    (b) the right not to be deprived of liberty without due process of law;
    (c) the right to be free from unreasonable interference with parent-child relationships;
    (d) the right to procedural due process; and
    (e) the right to be free from arbitrary intrusions on plaintiff's physical and emotional well-being.

Compl. at ¶ 30. His second count was brought as a Monell claim against the County, for patterns and practices of depriving parents of the right to participate in legal proceedings and failing to train social workers to afford parents substantive and procedural due process rights. Compl. at ¶¶ 33-34. On June 22, 2009, Defendants Castillo and Contra Costa County were voluntarily dismissed from this case. On the same day, Defendant Andrade filed her motion for summary judgment, which is presently before the Court.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 982 (9th Cir. 2001). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322-23.

**DISCUSSION**

Defendant Andrade asks the Court to grant summary judgment in her favor on the basis of three legal claims. First, Andrade argues that the doctrine of judicial estoppel should prevent Plaintiff Murray from even asserting his claims before this Court. Second, she

4

claims that as a social worker, she is entitled to absolute immunity in performing quasi-prosecutorial functions in child dependency hearings. Third, she claims that the doctrine of qualified immunity prevents Murray from asserting his claims against her. The Court will address each of these claims in turn.

Andrade first argues that summary judgment in her favor is warranted because Murray has presented incompatible positions in litigation, and should be barred from so doing by the doctrine of judicial estoppel. She specifically asserts that Murray's current legal claim, that his civil rights were violated when his child was placed in foster care, is incompatible with the legal position he maintained during his divorce proceedings, that no children resulted from his marriage to his ex-wife, who is the mother of Baby J. Murray disputes this characterization of the proceedings surrounding his divorce, noting that as he sought to obtain proof of paternity during the divorce proceedings, he cannot be said to have asserted that the child was not his. He further claims that the judicial orders in his divorce case were based on an absence of evidence, not his position in litigation. Finally, he argues that as California law mandates a presumption of paternity for children conceived during a marriage, he should have been presumed the father of Baby J.

Although the Supreme Court has noted that judicial estoppel is not a doctrine that is reducible to a simple formula, it has offered

> several factors [that] typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled[.] Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal citations and quotation marks omitted).

From the documents filed with the Florida court in Murray's divorce case, it is apparent to this Court that the doctrine of judicial estoppel bars his current case. During his

5

divorce, Murray expressly disavowed his paternity of the child that S.A.M. was carrying, while now he seeks to bring a case based upon his status as Baby J's father. *See* Holmes Decl., Ex. C, at 1-2, 4. To disavow paternity and then seek to assert it as the basis of a legal claim are "clearly inconsistent" positions. Murray successfully persuaded the Florida General Master and court that there were no children from his marriage to S.A.M., thus creating the perception in the mind of this Court that he succeeded in misleading the Florida court. Holmes Decl., Ex. C, at 6, 8. Although Murray asserts now that such a ruling was entered because the Florida court's order of a paternity test went unobeyed, and that the ruling represented an absence of evidence, not his position in the divorce case, his own petition before that court, and his reply following S.A.M.'s assertion of his paternity, belie his current argument. While Murray disputes this interpretation of the orders of the Florida court, his claim does not raise a genuine issue of material fact. His petition and reply, as well as the Florida court's orders, are perfectly clear. Murray asserted that he was not the father of Baby J on at least two occasions, and the Florida court's record indicates that it was convinced enough of this position to enter it as a finding of fact in the divorce case.

As to the third *New Hampshire* factor, Murray seeks to impose on Andrade the burden of monetary damages, and will do so if he is not estopped from asserting the position he previously denied. To permit Murray to avoid child support payments or supplemental payments to the County while Baby J was in child care by denying paternity, and then to allow him to assert his right to monetary damages, is to permit him to both derive an advantage from failing to pay in reliance on his lack of paternity and to impose a detriment on the County based on his newly-asserted paternity. To the extent that Murray argues that the California presumption of paternity militates against the application of the judicial estoppel doctrine here, his claim is unavailing. Although the Supreme Court permits the district court to weigh "[a]dditional considerations [that] may inform the doctrine's application in specific factual contexts," the high court noted that this doctrine is ultimately about the balance of equities. *New Hampshire*, 532 U.S. at 751. In the instant matter, a state law presumption does nothing, as a matter of equity, to reduce the fundamental injustice that

6

would result from permitting Murray's patent and multiple denials of the paternity of S.A.M.'s fetus to stand, and yet permitting him to raise his paternity as a key basis of recovery before this Court.  The doctrine of judicial estoppel therefore bars Murray from asserting the claims he raises in this case, as he seeks to impose detriment on the Defendant by maintaining a position that he expressly disavowed and successfully proved to a court of law in a previous proceeding.  On this basis, Defendant Andrade is entitled to summary judgment.

Andrade next asks the Court to grant her motion because Murray's claims are barred by the doctrine of absolute immunity, which she asserts applies to social workers performing their professional responsibilities in dependency proceedings.  Murray indicates that as this immunity is not unlimited, Andrade's conduct of Baby J's case exceeded the reasonable bounds of a social worker's discretion, and does not apply in this matter.

In *Meyers v. Contra Costa County Department of Social Services*, 812 F.2d 1154, 1157 (9th Cir. 1987), the Ninth Circuit announced "that social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings."  Yet this immunity is not unlimited, and the Ninth Circuit has found that fabricating evidence or making false statements in the course of a child dependency proceeding are not encompassed by this immunity.  *Beltran v. Santa Clara County*, 514 F.3d 906, 908-09 (9th Cir. 2008) (*per curiam*).  In so holding, the Ninth Circuit appears to have focused both on whether the conduct is prosecutorial or investigatory, as well as whether it was malfeasant or simply discretionary.  *See id.*

Andrade seeks to invoke this rule by demonstrating that as her actions were all taken as steps in the initiation and pursuit of the child dependency case, she is entitled to absolute immunity.  Murray argues that he is complaining of the failure to give him proper notice of the hearing, which is not discretionary, and therefore is not an aspect of absolute immunity.  Yet how and when notice is provided appears to this Court to be within the exercise of responsibilities that falls to the individual prosecuting social worker in child dependency hearings.  Andrade documents in her declaration the steps she took in initiating and pursuing

7

child dependency hearings in the case of Baby J. *See generally* Andrade Decl. To the extent that such responsibilities may be characterized as non-discretionary, Andrade's supervisor provided a declaration that Andrade's work met or exceeded departmental standards. Solomon Decl. at ¶ 4. Although the parties dispute precisely if and when Murray received notice of hearings in the case of Baby J, this factual dispute is immaterial to the application of the doctrine of absolute immunity. Andrade performed her prosecutorial functions, and whatever failures that Murray asserts typified her performance, rise nowhere close to the level of the fabrication of evidence or falsification of statements that the *Beltran* panel of the Ninth Circuit found to fall outside the bounds of quasi-prosecutorial immunity. Andrade's actions are covered by the absolute immunity that the Ninth Circuit has found to belong to social workers "performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." She is entitled to summary judgment on this basis as well.

As the Court has concluded that summary judgment in favor of the Defendant is warranted based on Andrade's first two arguments, the Court declines to reach the issue of qualified immunity.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The clerk shall enter judgment for Defendant Sandra Andrade, and close the case.

**IT IS SO ORDERED.**

Dated: July 28, 2009

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

8