**United States District Court**
For the Northern District of California

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    GREGORY MURRAY,

6                        Plaintiff,                NO. C08-01539 TEH

7            v.                                    ORDER RE: MOTION FOR
                                                   SUMMARY JUDGMENT
8    SANDRA ANDRADE,

9                        Defendant.

10

11       This matter came before the Court on June 27, 2011, on a motion for summary

12   judgment filed by Defendant Sandra Andrade ("Andrade" or "Defendant"). For the reasons

13   set forth below, Andrade's motion is DENIED.

14

15   **BACKGROUND**

16       This lawsuit arises from the placement of Baby J., the daughter of Plaintiff Gregory

17   Murray ("Murray" or "Plaintiff"), in foster care in 2006. Murray alleges that Andrade, a

18   Contra Costa County social worker handling Baby J.'s case, violated his due process rights.

19   At issue on this motion is whether Murray's claim is barred by qualified immunity.

20       Murray married S.A.M., Baby J.'s mother, on May 26, 2005, in Martinez, California.

21   The couple separated on July 9, 2005, and Murray filed for divorce in Sarasota, Florida, a

22   month later. In her response to the divorce petition, S.A.M. alleged that she was pregnant

23   with Murray's child. Murray responded by filing papers "den[ying] that he is the father of

24   [S.A.M.'s] child and request[ing] scientific testing to determine whether he is the father of

25   [S.A.M.'s] child . . . ." Holmes Decl., Ex. C., at 4. The Florida court ordered a paternity test.

26   Murray attempted to contact S.A.M. about the paternity test, but her phone was disconnected

27   and mail sent to her returned to him unopened. Murray hired an investigator, who also could

28   not locate S.A.M. S.A.M. missed two court dates in Sarasota – one to establish paternity and

United States District Court

For the Northern District of California

1    another to dissolve the marriage. The Florida court granted the divorce and found no

2    evidence of a child born of the marriage.

3            Baby J. was born on February 19, 2006, in California, and Contra Costa County's

4    Children and Family Services ("CFS") became involved because S.A.M. tested positive for

5    drugs immediately prior to delivery. S.A.M. called Murray in April 2006 and told him that

6    CFS had opened an investigation of S.A.M.'s treatment of her three children, including Baby

7    J. This was the first Murray had heard of Baby J.'s birth. He called CFS that same day and

8    spoke with Lori Castillo ("Castillo"), a social worker. The parties disagree about what they

9    discussed.[1] According to Murray, he told Castillo that he had been S.A.M.'s husband and that

10   if Baby J. were to be removed from S.A.M.'s custody, he wanted to be considered for

11   custody. He says that he asked Castillo for a paternity test, and Castillo told him she could

12   not give him any information because she could not be sure of who he was. Murray says he

13   gave Castillo extensive personal information so that she could corroborate his identity. He

14   says he called CFS frequently thereafter but never got a call back.

15           In the summer of 2006, Andrade became involved in Baby J.'s case as a court services

16   worker. Based upon documents in Baby J.'s case file, Andrade believed that Murray had left

17   S.A.M. shortly after S.A.M. told him she was pregnant. Furthermore, the fact that Murray

18   had lived with S.A.M., an admitted drug user, for two years, coupled with his conduct,

19   "caused concern that Mr. Murray may also be a drug abuser." Andrade Decl. ¶ 7. Andrade

20   filed a petition on behalf of S.A.M.'s three children in July 2006. The children were

21   represented by counsel, who requested that the children be removed from their mother's

22   custody. A detention hearing took place on August 9, 2006, and the court ordered Baby J.

23   removed from her mother's custody. Andrade states that she attempted to notify Murray of

24   this hearing, and Murray states that he learned of Baby J.'s removal from S.A.M. S.A.M. also

25   told Murray that Andrade was the new social worker. Murray called Andrade, who assured

26

27           [1] Andrade cannot prevail on this motion unless the facts, viewed in the light most
     favorable to Murray, entitle her to qualified immunity. As a result, the Court relies upon
28   Murray's facts where they conflict with Andrade's.

United States District Court

For the Northern District of California

1   him that Baby J. was safe. Murray says that he asked Andrade when court dates were

2   scheduled, where Baby J. was, what he had to do to get custody, and how to get a paternity

3   test. He says that Andrade refused to advise him of court dates or tell him where Baby J. was,

4   and that Andrade said she did not know what to tell him about how to proceed. Murray

5   explained to Andrade that his lawyer in Florida could not handle the case because he was not

6   licensed in California. Andrade did not tell Murray how to obtain counsel. Murray says that

7   he called Andrade and Castillo many times after this conversation and that neither returned

8   his calls.

9       The parties also disagree as to the information CFS made available to Murray

10  regarding Baby J.'s court proceedings. Murray states that he was not told the time or place of

11  the jurisdiction hearing and that he did not receive a report relating to this hearing. The

12  jurisdiction hearing took place on December 12, 2006, the same day as the disposition

13  hearing. Murray did receive a disposition hearing report, but said it arrived after the hearing

14  had taken place.[2] In October 2006, Murray received a set of documents to fill out from

15  Contra Costa County child support services.

16      Murray attempted to find an attorney to represent him, but had difficulty doing so in

17  light of how far he lived from California and the fact that few of the family lawyers he spoke

18  with took cases involving the juvenile courts. He says that S.A.M. would not tell Murray

19  court date information unless he returned to her and agreed to fight the juvenile case as a

20  couple. Murray contacted the governor of California and a radio talk show host in an attempt

21  to find counsel. Eventually Kim Taylor ("Taylor"), the social worker who took over the case

22  from Andrade after the disposition hearing, told Murray about the possibility of being

23  represented by the public defender. Murray contacted the public defender's office in

24  February 2007, and while that office could not represent him, someone there gave Murray

25  the fax number of the commissioner handling Baby J.'s case. Murray faxed a request for

26

27      [2] The disposition hearing was continued several times before it took place in
    December 2006. It is unclear whether Murray received the disposition report after one of the
28  continued hearing dates or after the actual hearing date.

United States District Court
For the Northern District of California

1   appointment of counsel to the commissioner. The commissioner appointed an attorney to

2   represent Murray and Murray appeared in the proceedings on March 22, 2007. During that

3   appearance, Murray learned that CFS had been investigating Baby J.'s circumstances since

4   her birth and that Murray was named as the father on her birth certificate. He also learned

5   that CFS recommended that Baby J. be adopted by her foster parents. The court ordered a

6   DNA test at that hearing, and Murray submitted to testing that day. With the help of counsel,

7   he received a copy of the petition, the detention report, and the jurisdiction report –

8   documents he says he had never seen before.

9          The paternity test revealed that Murray was Baby J.'s father, and in May 2007 the

10  court recognized this finding. Murray was granted custody on August 30, 2007.

11         On March 20, 2008, Murray filed suit in this Court against Andrade and two other

12  defendants that have since been dismissed from the case. Murray's § 1983 claim alleges that

13  Andrade deprived him of his rights under the Due Process Clause of the Fourteenth

14  Amendment and other constitutional provisions. On July 28, 2009, the Court granted

15  Andrade's motion for summary judgment on estoppel and absolute immunity grounds. The

16  Ninth Circuit reversed and remanded, and the question currently before the Court is whether

17  Andrade is entitled to summary judgment on the basis of qualified immunity.

18

19  **LEGAL STANDARD**

20         Summary judgment is appropriate when there is no genuine dispute as to material

21  facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

22  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby,*

23  *Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is

24  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The

25  Court may not weigh the evidence and must view the evidence in the light most favorable to

26  the nonmoving party. *Id.* at 255.  The Court's inquiry is "whether the evidence presents a

27  sufficient disagreement to require submission to a jury or whether it is so one-sided that one

28  party must prevail as a matter of law." *Id.* at 251-52.

4

**United States District Court**
For the Northern District of California

1  A party seeking summary judgment bears the initial burden of informing the Court of

2  the basis for its motion, and of identifying those portions of the pleadings and discovery

3  responses that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

4  *Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at

5  trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than

6  for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

7  However, on an issue for which its opponents will have the burden of proof at trial, the

8  moving party can prevail merely by "pointing out ... that there is an absence of evidence to

9  support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its

10  initial burden, the opposing party must "set out specific facts showing a genuine issue for

11  trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256.

12

13  **DISCUSSION**

14  Andrade argues that summary judgment should be granted as to Murray's § 1983

15  claim because she is entitled to qualified immunity. According to the Ninth Circuit,

16  [a]n official is entitled to summary judgment on the ground of
qualified immunity where his or her "conduct does not violate
17  clearly established statutory or constitutional rights of which a
reasonable person would have known." *Harlow v. Fitzgerald*, 457
18  U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Until
recently, courts considering an official claim of qualified
19  immunity followed the two-step protocol established in *Saucier v.
Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),
20  which required us first to determine whether the defendant
violated a constitutional right and then to determine whether the
21  right was clearly established. *See Pearson v. Callahan*, – U.S. —,
129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (overturning *Saucier*
22  in part). In *Pearson v. Callahan*, the Supreme Court reversed this
earlier rule and gave courts discretion to grant qualified immunity
23  on the basis of the "clearly established" prong alone, without
deciding in the first instance whether any right had been violated.
24  *Id.* Thus, we may grant qualified immunity if "the facts that a
plaintiff has alleged or shown [do not] make out a violation of a
25  constitutional right" or if "the right at issue was [not] 'clearly
established' at the time of defendant's alleged misconduct." *Id.* at
26  816, 818 (internal citations omitted).

27  *James v. Rowlands*, 606 F.3d 646, 650-51 (9th Cir. 2010) (alteration in original).

28

1      The Court will first consider whether Murray's facts make out a constitutional

2 violation. It will then turn to whether this right was clearly established at the time of

3 Andrade's alleged misconduct.

4

5 **I. The Constitutional Right**

6      "The Fourteenth Amendment's Due Process Clause protects parents' well-established

7 liberty interest in the 'companionship, care, custody, and management of [their] children.'"

8 *Id.* at 651 (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L.Ed.

9 2d 640 (1981), which notes that the importance of this right is "plain beyond the need for

10 multiple citation"). "This right is not reserved for parents with full legal and physical

11 custody." *Id.* The Ninth Circuit has recognized that parents with visitation rights, but no legal

12 or physical custody, have a liberty interest in the companionship, care, custody, and

13 management of their children. *Id.* (citing *Brittain v. Hansen*, 451 F.3d 982 (9th Cir. 2009)).

14 These parents' rights are "unambiguously lesser in magnitude than that of a parent with full

15 legal custody." *Id.* (quoting *Brittain*, 451 F.3d at 992). Lesser magnitude does not mean

16 nonexistent, and people with potential parental rights, such as alleged fathers whose paternity

17 has not yet been established, have a protected liberty interest in the care, custody, and

18 management of their children.[3]

19      "The fundamental requisite of due process of law is the opportunity to be heard."

20 *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950)

21 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914)).

22 "This right to be heard has little reality or worth unless one is informed that the matter is

23 pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.*

24 As the Supreme Court explained further:

25

26      [3] "Alleged parent" is a term of art under state law. The parties disagree as to whether
Murray is an alleged or a "presumed parent" in light of his marriage to Baby J.'s mother.
27 They agree that he was at least an alleged parent. Because this distinction is irrelevant to the
outcome of this order, the Court need not determine whether Murray was a presumed parent
28 or the significance of this designation under the qualified immunity analysis.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. . . .
>
> But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

11   *Id.* (citations omitted).

12        The Court finds that the parties have presented a genuine issue of material fact as to

13   whether Andrade's efforts to notify Murray were reasonably calculated to apprise him of the

14   proceedings that followed Baby J's placement in protective custody. Murray and Andrade

15   agree that they spoke on the phone in August 2006 following the detention hearing.

16   According to Murray, Andrade refused to inform him of upcoming court dates or tell him any

17   information about how to assert his rights. He says that the only notice provided to him was

18   the disposition hearing report, which arrived after the hearing had taken place.  Andrade

19   attempted to contact Murray in advance of the detention hearing, but Murray's evidence

20   raises a triable issue of fact as to whether Andrade's actions were a mere gesture. This is

21   sufficient to require submission to a jury.

22        Finding that Murray has raised a triable issue of fact as to whether Andrade violated

23   his due process rights, the Court turns to whether Murray's rights were clearly established.

24

25   **II. Whether the Right Was Clearly Established**

26        The Plaintiff

27        bears the burden of proving that the rights [he] claims were clearly established at the time of the alleged violation. The

28        contours of the right must be sufficiently clear that a reasonable

7

United States District Court

For the Northern District of California

1

2

official would understand that what he is doing violates that right. Notwithstanding this particularity requirement, closely analogous preexisting case law is not required to show that a right was clearly established.

3

*Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009) (quotations and citations omitted).

4

5

An alleged father's due process right to reasonable notice was clearly established at the time of Andrade's alleged misconduct. In his opposition, Murray cites *In re Emily R.*, a state appellate decision in which an alleged father, Michael U., sought to set aside dispositional findings on the grounds he was not provided notice in violation of his federal due process rights. 80 Cal. App. 4th 1344, 1351 (2000). When the defendant department of human services became aware that Michael U. was the alleged father of Emily R., the social worker assigned to the case attempted to notify Michael U. at several stages of the dependency proceedings. She attempted to telephone him at his last known address and she sent notice to several of his last known addresses. *Id.* at 288-89. The department ultimately effected service by publication. The court in *In re Emily R.* upheld the lower court's finding that notice by publication was sufficient under the circumstances, where Michael U.'s address was unknown and could not be determined with due diligence. *Id.* at 1354.

6

7

8

9

10

11

12

13

14

15

16

17

The Court requested supplemental briefing from the parties regarding whether this case clearly establishes the contours of an alleged father's right to notice under the Due Process Clause. The Court finds that it does. Andrade attempts to distinguish *In re Emily R.* on its facts – noting, for example, that Murray is an adult and Michael U. was a minor, and that Murray knew that social services had opened an investigation of Baby J. while Michael U. was largely unaware that he had fathered a child. Nonetheless, *In re Emily R.* clearly holds that alleged fathers are entitled to notice reasonably calculated to inform them of dependency proceedings. A reasonable social worker aware of this right could not fail to understand that Andrade's conduct, as Murray describes it, violates that right. According to Murray, Andrade did not provide him with any notice of the proceedings. During their phone conversations, she refused to tell him about upcoming court dates. She mailed him a disposition hearing report that arrived after the disposition hearing took place. Andrade argues that denying its

18

19

20

21

22

23

24

25

26

27

28

8

United States District Court

For the Northern District of California

1   motion would necessarily imply that Murray was entitled to actual notice. This is not the

2   case. Murray was entitled to notice reasonably calculated to inform him of the dependency

3   proceedings. In light of *In re Emily R.* and the rules regarding notice articulated in *Mullane*, a

4   reasonable social worker could not have believed that refusing to answer direct questions

5   regarding hearing dates, coupled with an attempted notification and a late hearing report, was

6   lawful.[4] While these are the facts as Murray portrays them, it is up to the jury, not the Court,

7   to weigh Murray's account against Andrade's.

8          Andrade also cites California notice statutes in an attempt to show that social workers

9   are not responsible for notifying alleged parents of dependency proceedings. Yet as Andrade

10  argues elsewhere in her papers, state statutes do not set the limits of an alleged parent's due

11  process rights. The Court finds that Murray's rights and her role in relation to them were

12  clear such that a reasonable social worker would have known that failing to tell Murray of

13  upcoming court dates violated his due process rights.

14         Finally, Andrade argues that two Ninth Circuit cases, *James v. Rowlands* and *Burke v.*

15  *County of Alameda*, show that Murray's rights were not clearly established when Andrade

16  worked on Baby J.'s case. *See James*, 606 F.3d 646; *Burke*, 586 F.3d 725 (2009). Yet these

17  cases explore parents' due process rights before the commencement of judicial proceedings,

18  not after. *James v. Rowlands*, 606 F.3d 646 (9th Cir. 2010); *Burke v. County of Alameda*, 586

19  F.3d 725 (9th Cir. 2009); *Brittain*, 451 F.3d at 1000 (noting that "Brittain has not alleged any

20  failure of post-deprivation proceedings"). Andrade argues that because the parental rights

21  involved in those cases were more substantial than Murray's, and because Murray's

22  circumstances are "less compelling," Murray's rights cannot have been clearly established.

23  Def.'s Further Supp. Reply 4:26, July 13, 2011. While these cases do not clearly establish

24  Murray's rights, they do not prevent another case from doing so. Andrade's motion for

25  summary judgment is DENIED.

26

27          [4] At oral argument, the Court asked Andrade whether a state court case can clearly
    establish federal constitutional rights for the purposes of a qualified immunity analysis.
    Andrade presented no authority suggesting that it could not. *James*, which analyzes to

28  whether state statutes create due process rights, is inapposite. *See* 606 F.3d at 656-57.

9

**United States District Court**
For the Northern District of California

1  **CONCLUSION**

2        For the reasons set forth above, Andrade's motion for summary judgment is DENIED.

3

4  **IT IS SO ORDERED.**

5

6  Dated: 8/5/11

7                                THELTON E. HENDERSON, JUDGE
                                 UNITED STATES DISTRICT COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10